IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| v.                             ) | 1:15cr19 |
| ) | **Electronic Filing** |
| **RAHEEM HASAN CARNEY** ) | |

## MEMORANDUM ORDER

AND NOW, this 23rd day of January, 2023, upon due consideration of Raheem Hasan Carney's ("defendant") motion for reduction of sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) and request for "emergency" consideration, as supplemented, [84] his submitted medical records, and the parties' submissions in conjunction therewith, IT IS ORDERED that [83] the motion [90] as supplemented be, and the same hereby is, DENIED.

On May 12, 2015, defendant was indicted on five separate counts. He subsequently pled guilty to count four – possession of a firearm by a convicted felon; and count five – possession with intent to distribute less than 100 grams of heroin. He was sentenced to 92 months at each count, to run concurrently. Thereafter, defendant filed the motion for compassionate release, as supplemented. The motion as supplemented is now pending before the court.

Section 601(b) of the First Step Act of 2018 made modifications to 18 U.S.C. § 3582, which previously authorized the Director of the Bureau of Prisons to file a motion with the court to modify a term of imprisonment that had already been imposed where "extraordinary and compelling reasons warrant[ed] such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). While defendant indicates that the warden at FCI Allenwood Medium denied his first request for compassionate release, Section 601(b) of the First Step Act authorized prisoners to present such motions for "compassionate release" directly to the court. Defendant has requested relief pursuant to such a motion.

In support of his motion, defendant identifies a number of what he believes are "extraordinary and compelling reasons" that support compassionate release. He asserts these grounds are unique and warrant relief under an individualized assessment. They include, but are not limited to, (1) his risk of severe illness and/or complications from COVID-19 due to being 44 years of age;[1] (2) his physical conditions of a) being pre-diabetic, hypertensive, obese, a previous smoker, and a burn survivor, and b) suffering from *self-reported* sleep apnea; (3) recent outbreaks of COVID-19[2] infection at FCI Allenwood Medium and the purported inability of the facility to contain the virus and protect inmates like defendant due to "too many people, inside too small of an unsanitary space, sharing too many things;" and (4) defendant not being a danger to others or the community.

Defendant has failed to demonstrate that the court should exercise its discretion and grant the relief he seeks. The compassionate release provision states that a district court "may reduce the term of imprisonment" and "impose a term of probation or supervised release" if it finds that "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). Before granting compassionate release, a district court must consider "the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable." § 3582(c)(1)(A). Those factors include, among other things, "the nature and circumstances of the offense and the history and characteristics of the defendant," § 3553(a)(1), and the need for the sentence to "reflect the seriousness of the offense, [] promote respect for the law, [] provide just punishment for the

---

[1] Defendant was 44 years old when he filed his initial petition on May 18, 2021.
[2] The novel coronavirus, or SARS-CoV-2, is a virus that spreads through exposure to respiratory fluids such as droplets or aerosol particles. See https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/sars-cov-2-transmission.html. The disease that can result from exposure is known as COVID-19, which was first identified by the World Health Organization on February 11, 2020. https://www.cdc.gov/coronavirus/2019-ncov/your-health/about-covid-19/basics-covid-19.html.

offense; [] afford adequate deterrence to criminal conduct; [and] protect the public from further crimes of the defendant." § 3553(a)(2)(A)-(C).

On balance, review of the available information pursuant to all the relevant factors does not warrant the relief defendant seeks. The court recognizes that the defendant's conditions of being obese, hypertensive, and a previous smoker, likely place him at heightened risk for more severe complications from COVID-19. See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (identifying obesity, being a former smoker, and *possibly high blood pressure*[3] as conditions which increase the risk for more severe complications and outcomes from COVID-19 disease). However, the CDC does not recognize pre-diabetes, sleep apnea[4] or being a burn survivor as ailments that increase one's risk for more severe complications. Thus, defendant does have conditions that could rise to the level of and provide a basis for the existence of extraordinary and compelling circumstances. But these conditions are not the sum-total of what the court must consider and the remaining information available meaningfully undercuts defendant's request for compassionate release.

First, the enhanced risks defendant faces within the institution must be balanced against the Bureau of Prisons' persistent and ongoing efforts to control outbreaks of the disease and implement measures that fulfill its statutory obligation to provide inmates with a safe environment and needed medical care. See https://www.bop.gov/coronavirus; accord United States v. Raia, 954 F.3d 594, 596 (3d Cir. 2020) ("We do not mean to minimize the risks that COVID-19 poses in the federal prison system, particularly for inmates like Raia. But the mere

---

[3] The CDC distinguishes between pulmonary hypertension and "regular" hypertension. Id. While pulmonary hypertension (high blood pressure in the lungs) is listed as "a chronic lung disease that can make one more likely to get very sick from COVID-19," "regular" hypertension is only identified as *possibly* making an individual more susceptible to severe illness from COVID-19. Id.

[4] As indicated above, the defendant has not been formally diagnosed by a medical doctor with sleep apnea.

3

existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread.") (citing the BOP's COVID-19 Action Plan); United States v. Stallings, 2020 WL 3619071, *4 (M.D. Pa. July 2, 2020) (extensive efforts of BOP in preventing and controlling outbreaks of COVID-19 properly are considered in assessing its ability to manage an inmate's institutional and medical needs). That plan has involved modified operations since the initial outbreak of COVID-19, *see* BOP Modified Operations (https://www.bop.gov/coronavirus/covid19_status.jsp), along with refined measures that have been informed by collaboration with the Coronavirus Task Force, the Center for Disease Control and the COVID-19 Vaccine/Therapeutics Operation. https://www.bop.gov/coronavirus.

As of January 19, 2023, the BOP reports having 145,333 federal inmates in BOP-managed institutions and 12,883 in community-based facilities. Its staff complement is approximately 36,000. It has about 125 federal inmates and 268 BOP staff who have "confirmed" positive test results for COVID-19 nationwide. Currently, 46,765 inmates and 14,815 staff have recovered. There have been 312 federal inmate deaths and 7 BOP staff-member deaths attributed to COVID-19. Of the inmate deaths, 11 occurred while on home confinement. Id. These statistics appear to be the product of a reasonable response to and management of the risks posed by the relentless SARS-CoV-2 virus and its ongoing mutations.

More specifically, defendant is being housed at FCI Allenwood Medium ("Allenwood"). Allenwood has only experienced one inmate death; it also had 491 inmates and 54 staff members who have recovered from COVID-19. Id. As of this date, the facility is not reporting any positive tests among inmates or staff. Id. These circumstances further undercut the current and recurrent degree of risk which defendant faces. Cf. United States v. Henderson, -- F. Appx. --, --

4

, 2021 WL 2156910, *2 (3d Cir. May 27, 2021) ("As the [District] Court explained, the outbreak of COVID-19 at FCC-Allenwood (where Henderson was housed) had been contained and, at the time of the decision, there was only 1 active case at the prison complex.  Thus, the risk of Henderson contracting COVID-19 was low and did not constitute an 'extraordinary and compelling reason' for a sentence reduction.").

Moreover, the BOP's modified operations plan has included a roll-out of the available vaccines to staff and inmates.  To date, the BOP has been able to administer over 345,625 doses of COVID-19 vaccine to both staff and inmates throughout the nation.  Id.[5]  After the administration of over 666 million doses of the available COVID-19 vaccines under the current emergency authorizations, the CDC continues to report that they are safe and effective.  See https://www.cdc.gov/coronavirus/2019-ncov/vaccines/safety/safety-of-vaccines.html.  General side effects are minimal and minor and serious adverse reactions have been rare.  Id.  Indeed, anaphylaxis can be treated and successfully controlled shortly after injection through established medical protocol and the rare response of thrombosis with Thrombocytopenia Syndrome after receiving the J &J vaccine occurs in women at the rate of approximately seven cases per one million vaccinated individuals.[6]  Id.  The ongoing availability of the vaccines and their concomitant safety record further diminish the risk of severe sickness or death to all of the inmates under the BOP's care, including defendant.  Cf. https://www.bop.gov/coronavirus (noting the increase in control of the virus from the BOP's ongoing roll-out efforts); https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/work.html (noting the

---

[5] This number does not include staff who received their vaccines through a community provider.  Id.

[6] On May 22, 2022, the FDA limited the authorized use of the J & J vaccine to adult individuals who are unable to receive one of the MRA vaccines.  See https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/janssen-covid-19-vaccine.

effectiveness of the approved vaccines against severe illness, complications and death among all age groups).

Against this backdrop, a decision to reject vaccination cannot displace the diminishing effects that the availability of the vaccines have had on the risks facing inmates such as defendant. Absent some compelling justification, the insidious decision to decline the vaccine when offered by the BOP negates an inmate's basic contention that release is warranted due to the existence of extraordinary and compelling medical reasons. See United States v. Jackson, 2021 WL 1145903, *2 (E.D. Pa., March 25, 2021) ("Where Jackson bears the burden of demonstrating her entitlement to relief, the Court finds that her unexplained refusal to accept a COVID-19 vaccination when offered negates her otherwise compelling medical reasons for release.") (collecting cases in support); United States v. Austin, 2021 WL 1137987, *2 (E.D. Mich. March 25, 2021) ("A prisoner cannot on the one hand point to the risk of severe illness, while on the other hand refuse to participate in basic precautionary measures such as vaccination."). Although the record indicates that the defendant initially declined to be vaccinated, he did ultimately receive two doses of the Moderna COVID-19 vaccine in May and June of 2021.

In short, while defendant's medical conditions could create real risks of contracting COVID-19, and to a lesser degree, developing complications resulting in severe illness and/or death, the potential for these risks to materialize must be viewed through the lens of the BOP's ongoing response to the SARS-CoV-2 and its efforts to provide for defendant's medical needs. Viewed in this context, defendant has not met his burden of demonstrating extraordinary and compelling circumstances warranting his immediate release.

Even assuming for the sake of argument that defendant has presented medical conditions which substantially affect his vulnerability to severe complications in the event he contracts COVID-19, relief still is inappropriate after balancing the applicable § 3553(a) factors.

Defendant pled guilty to possession of a firearm by a convicted felon and possession with intent to distribute heroin.

Defendant had a substantial history of prior criminal conduct. At the time the instant federal offenses were committed, defendant had three prior drug trafficking convictions. Further, one of the loaded firearms that was found in defendant's home was confirmed to be an FBI service weapon stolen from an FBI Special Agent during a burglary of the agent's home in Erie. Additionally, defendant has several prior adult convictions which include possession with intent to deliver both marijuana and/or cocaine, terroristic threats, intimidation of a witness, harassment, and criminal trespass.

Defendant likewise had a long history of substance abuse involving marijuana, alcohol and cocaine, which began at a young age. He did not have a significant work history during the years preceding the instant offenses and he has spent a majority of his adult life in prison.

While defendant claims that he does not pose a danger to the safety of others or to the community, defendant's offense conduct, his prior criminal history and his personal background information provide strong justification for the sentence originally imposed. The offense was serious, there was and is a real need to deter others from engaging in similar criminal conduct, and there remains a meaningful need to protect the public from future crimes by defendant. Defendant's plan of re-integration (which contemplates moving in with his mother in Philadelphia, Pennsylvania, in lieu of serving additional time at a BOP institution) does not diminish these penological needs. In other words, defendant's early release plans do not displace the import of the many factors that support maintaining the sentence as originally imposed.

The guidelines were carefully and thoroughly considered in the parties' negotiations leading to the plea agreement, and defendant received significant benefit as part of that bargaining process.  Further, the criminal conduct at issue and defendant's criminal history netted a guideline sentencing range of 151 to 188 months.  After careful consideration of all the attendant circumstances, this court sentenced defendant to 92 months of incarceration.  This sentence was affirmed by the United States Court of Appeals for the Third Circuit.  Nothing has been presented to suggest that the offense conduct would or should be treated less harshly today, especially after recognizing that defendant's sentence was *substantially below* the guideline range.

In short, a review and re-evaluation of the § 3553(a) factors continue to favor the original sentence, even when balanced against the increased risks presented by defendant's medical conditions vis-a-vis the current public health crisis and the more restrictive nature of ongoing confinement within the current institutional environment.  Consequently, defendant's motion for relief pursuant to the CARES Act for the above reasons is hereby denied.

s/David Stewart Cercone  
David Stewart Cercone  
Senior United States District Judge

cc:    Christian A. Trabold, AUSA  
      James K. Paulick, Esquire  
      Gabrielle Lee, AFPD

      (*Via CM/ECF Electronic Mail*)

      Raheem Hasan Carney  
      Register #35712-068  
      FCI Allentown Medium  
      Federal Correctional Institution  
      P.O. Box 2000  
      White Deer, PA 17887

      (*Via First Class Mail*)